# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF KENTUCKY

Eastern District of Kentucky
**FILED**

FEB 7 - 2006

AT COVINGTON
LESLIE G WHITMER
CLERK U S DISTRICT COURT

2-06-cv-27

# DAVID L. BUNNING

**GEORGE STEVEN DUBBA**
207 Country Club
Oxford, Ohio 45056

and

**GLADYS, INC. dba AMERISTOP FOOD MART #29098**
5930 Fairfield Road
Oxford, Ohio 45056

and

**RAMU KESIREDDY AND UMA KESIREDDY**
6654 Eagle Creek Drive
Hamilton, Ohio 45011

and

**SAI NIKETAN, INC. dba AMERISTOP FOOD MART #29064**
3251 W. Montgomery Road
Loveland, Ohio 45140

and

**YOGESH U. PATEL and NITABEN PATEL**
2069 Anderson Cove
Cincinnati, Ohio 45255

and

**JAY & KRUPA, Inc. dba AMERISTOP FOOD MART 29015**
481 Old State Route 74
Mt. Carmel, Ohio 45244

and

**MOHAN R. and SUNITHA R. TOKALA**
6317 Rosemont Lane
Mason, Ohio 45040

and

{W0646537.1}

**SAI PRITAM, Inc. dba AMERISTOP FOOD
MART #29003**
1629 E. Kemper Road
Sharonville, Ohio 45246,

      **Plaintiffs,**

v.

**OHIO VALLEY AFM, INC.**
3955 Alexandria Pike
Cold Spring, Kentucky 41076-0268,

      **Defendant**.

## MOTION FOR TEMPORARY RESTRAINING
## ORDER AND PRELIMINARY INJUNCTION
## CERTIFICATION OF COUNSEL UNDER RULE 65(b)

Plaintiffs, George Steven Dubba, Gladys, Inc., Ramu and Uma Kesireddy, Sai

Niketan, Inc., Yogesh and Nitaben Patel, Jay & Krupa, Inc., Mohan R.  and Sunitha R.

Tokala, and SAI Pritam, Inc. (collectively, "Plaintiffs" or "Franchisees") move this Court

pursuant to Rule 65(b) of the Federal Rules of Civil Procedure for a temporary restraining

order enjoining Defendant Ohio Valley AFM,  Inc. ("Ohio Valley") from  terminating

any of the Franchisees' Franchise Agreements or Related Agreements pending a full and

fair accounting of all monies flowing through the Franchisees' Store Accounts (over

which Ohio Valley has complete control), and all other proceeds and profits improperly

accounted for or unjustly obtained by Ohio Valley.

Marcia V. Andrew, attorney for Plaintiffs, hereby certifies that she has attempted

to give notice to Defendant by calling called Mary Beth Gettins, Corporate Counsel for

Ohio Valley, and John Cox, statutory agent, both at (859)781-3800 during business hours

## NOTICE

This motion will come to be heard before the Court with counsel present or ex parte in accordance with Civil Rule 65 on February 8, 2006 at an hour convenient to the Court.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served via regular U.S. Mail, postage prepaid, upon John Cox, statutory agent for Defendant Ohio Valley AFM, Inc., 3955 Alexandria Pike, Cold Spring, KY, 41076, this 7th day of February, 2006.

_____

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF KENTUCKY

**GEORGE STEVEN DUBBA**
207 Country Club
Oxford, Ohio 45056

and

**GLADYS, INC. dba AMERISTOP FOOD
MART #29098**
5930 Fairfield Road
Oxford, Ohio 45056

and

**RAMU KESIREDDY AND UMA KESIREDDY**
6654 Eagle Creek Drive
Hamilton, Ohio 45011

and

**SAI NIKETAN, INC. dba AMERISTOP FOOD
MART #29064**
3251 W. Montgomery Road
Loveland, Ohio 45140

and

**YOGESH U. PATEL and NITABEN PATEL**
2069 Anderson Cove
Cincinnati, Ohio 45255

and

**JAY & KRUPA, Inc. dba AMERISTOP FOOD
MART 29015**
481 Old State Route 74
Mt. Carmel, Ohio 45244

and

**MOHAN R. and SUNITHA R. TOKALA**
6317 Rosemont Lane
Mason, Ohio 45040

and

{W0646537.1}

**SAI PRITAM, Inc. dba AMERISTOP FOOD**
**MART #29003**
1629 E. Kemper Road
Sharonville, Ohio 45246,

   **Plaintiffs,**

v.

**OHIO VALLEY AFM, INC.**
3955 Alexandria Pike
Cold Spring, Kentucky 41076-0268,

   **Defendant.**

## MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

### I.  INTRODUCTION

Plaintiffs, George Steven Dubba, Gladys, Inc., Ramu and Uma Kesireddy, Sai Niketan, Inc., Yogesh and Nitaben Patel, Jay & Krupa, Inc., Mohan R. and Sunitha R. Tokala, and SAI Pritam, Inc. (collectively, "Plaintiffs" or "Franchisees") are before the Court seeking to enjoin Defendant Ohio Valley AFM, Inc. ("Ohio Valley") from terminating any of the Franchisees' Franchise Agreements or Related Agreements pending a full and fair accounting of all monies flowing through the Franchisees' Store Accounts (over which Ohio Valley has complete control), and all other proceeds and profits improperly accounted for or unjustly obtained by Ohio Valley.

This is an action by four native Indian AmeriStop Franchisees for enforcement of their civil rights to prevent Defendant Ohio Valley from discriminating against them in the making and enforcement of contracts, on the basis of their race and national origin, in violation of 42 U.S.C. § 1981; for relief from material breaches of their Franchise Agreements by the franchisor, Ohio Valley, that have been so substantial as to destroy the

essential purpose of the agreements and deprive the Franchisees of the benefit of those agreements; for rescission of the Franchise Agreements and Related Agreements on the grounds of material breach, fraud, duress and coercion by Ohio Valley; for an accounting by Ohio Valley which controls all accounting functions for the Franchisees and has failed to promptly and accurately report to the Franchisees; for recovery under ERISA of benefits due to them as common law employees; and for unjust enrichment.

Ohio Valley has threatened to lock two of the Franchisees, Mr. Dubba and Mr. Kesireddy, out of their AmeriStop stores on Friday, February 10, 2006, if they have not complied with its unreasonable demands for immediate payment before that date of disputed amounts.  Ohio Valley has demanded that the Patels vacate the premises of their AmeriStop store by February 23, 2006, with no opportunity to cure.  Ohio Valley has issued an ultimatum to Mr. Tokala that it will terminate his Franchise Agreement if he does not comply with their impossible demand to remove, by February 24, 2006, a security interest in favor of the bank that financed his purchase of his AmeriStop store.

Franchisees require immediate injunctive relief to avoid substantial and irreparable harm that will result to Franchisees if Ohio Valley is permitted to lock them out of their stores, stripping them of their livelihood and forfeiting their substantial investments in these businesses, based on alleged breaches of the Franchise Agreements, when it is Ohio Valley that has breached the agreements, breached its duty of good faith and fair dealing, and unjustly enriched itself at the expense of the Franchisees.

## II.    STATEMENT OF FACTS[1]

### A.    The Initial Investment in AmeriStop Franchises

Each of the Franchisees invested substantial sums of money to purchase the right

to operate an AmeriStop Food Mart Store.  Each paid between $110,000 and $170,000

for the franchise rights, equipment, inventory and goodwill.  Each of the Franchisees

understood, based on representations by Ohio Valley prior to their investment, that the

purchase of the franchise would permit them to exercise their independent business

judgment and, aided by the AmeriStop franchise concept and further guidance from Ohio

Valley, and their own hard work, their investments would yield them a reasonable profit.

Each of the Franchisees entered into a substantially identical Franchise

Agreement with Ohio Valley (hereafter referred to as the "2001 Franchise Agreement"),

in addition to related agreements particular to each franchisee, including Sublease

Agreements, Credit and Security Agreements, Personal Guaranty and Indemnity

Agreements and, for those Franchisees who operate gasoline stations in connection with

their AmeriStop stores, a Motor Fuels Agreement (collectively, "Related Agreements").

Verified Complaint, Exh. A.

Ohio Valley required that each franchisee enter into the 2001 Franchise

Agreement and Related Agreements as a condition to becoming an AmeriStop franchisee,

and refused to negotiate any of the terms.  The agreements were drafted by Ohio Valley

and presented unilaterally as a "take it or leave it" package.

The 2001 Franchise Agreement is completely one-sided and onerous.  For

example, Ohio Valley may dictate virtually every aspect of the operation of the

AmeriStop store, including its use, its appearance, cleanliness and atmosphere, hours of

---

[1]  The facts are found in the Verified Complaint, filed contemporaneously.

operation, sign and equipment service and maintenance, lighting and sign illumination, crime prevention, and dress code, and may require remodeling at any time at franchisee's cost (Section 7). Further, Ohio Valley has sole discretion to determine what type of merchandise and what brands a franchisee can sell in its stores and from whom the franchisee may purchase such merchandise, and may dictate details regarding inventory and display, cash registers, computers and software (Section 8).

Ohio Valley has assumed control of all accounting and financial management functions of the stores. The franchisee must deposit all sales receipts and funds "of all manner excluding none" in a bank account for the benefit of and under the control of Ohio Valley, on the balance of which Ohio Valley does not pay interest until the sum exceeds $95,000, but as to which Ohio Valley charges interest on any deficit no matter how small (Section 13). The franchisee is required to make daily deposits of receipts and to send daily reports to Ohio Valley, yet Ohio Valley is only required to report monthly to franchisee (Section 13). Franchisees have no access to their own money or profits, except for twice-yearly disbursements of Drawable Cash (their profits) (Section 13.5).

Rights and obligations with respect to termination and renewal are similarly stacked against the Franchisees. Franchisee has no right to renew the agreement, must give notice at least one year in advance of its desire to renew the agreement, and must release Ohio Valley from any and all claims as a condition of any renewal (Section 17). Ohio Valley may terminate the agreement without any prior notice or opportunity to cure, for any failure to comply with any obligation, but franchisee has no right to terminate the agreement (Section 18). Upon termination or non-renewal, Ohio Valley has the option

Ohio Valley has interfered in the relationship between the Franchisees and their vendors, taking over this relationship completely. Ohio Valley now negotiates the price, the purchase discount and any other promotional allowances or volume discounts. Ohio Valley has failed to inform the Franchisees in a timely manner of the price, discounts and allowances on merchandise. As a result, the Franchisees do not know their net unit cost for merchandise and are unable to make an informed business judgment as to the appropriate retail price for such merchandise. Some vendors do not even include a base price per unit on their delivery invoice.

Franchisees believe that Ohio Valley is receiving kick-backs or allowances from vendors for mandating that the vendor will be the sole approved supplier for a particular brand or category for all AmeriStop Franchisees, and is not passing those kick-backs or allowances through to the Franchisees.

Ohio Valley has impermissibly mandated the maximum retail price at which the Franchisees may sell merchandise in their stores, without any consideration for Franchisees' costs and whether the Franchisees will make a profit or a loss when they sell at the required price. When combined with the requirement that Franchisees are only permitted to buy approved merchandise from approved vendors, at a price negotiated by Ohio Valley, mandated retail prices have resulted frequently in Ohio Valley requiring the Franchisees to sell merchandise below cost, at a loss. Ohio Valley has no risk of loss, because it collects its 4% royalty on each sale and a kickback from the vendor.

Ohio Valley has failed to promptly and accurately account to Franchisees as required by Section 13.7. Ohio Valley sends monthly statements that lack itemization, and does not return the invoices to the franchisee until many months later. As a result,

7

Franchisees are not able to determine whether Ohio Valley is accurately reporting all income, allowances, payments and disbursements. Franchisees have discovered many instances of errors in their accounts, including charging a franchisee for expenses incurred by a different store, failing to pay invoices within credit terms resulting in a late fee charged to the franchisee, and paying vendors twice for the same invoice.

These arrangements, especially Ohio Valley's complete control of the required Store Account and of the vendor relationships, together with the one-sided 2001 Franchise Agreement, create a situation in which the Franchisees must place complete faith and trust in Ohio Valley to act in good faith and in the Franchisees' best interests. Ohio Valley's assumption of these financial management duties has created a fiduciary duty on its part to act honestly, in good faith and in the Franchisees' best interests.

### C.    Ohio Valley's Threats to Mr. Kesireddy

The 2001 Franchise Agreement between the Kesireddys and Ohio Valley expired by its terms on April 28, 2004. Neither party noticed the expiration, and both parties continued to operate as if the agreement was in full force and effect. In late August or early September 2005, Ohio Valley offered to Mr. Kesireddy a renewal of the 2001 Franchise Agreement through April 28, 2009, on the same terms and conditions, despite the fact that Mr. Kesireddy, according to Ohio Valley's accounting, had a stated deficit of more than $70,000 in his Store Account.

Ohio Valley promised that Mr. Kesireddy would experience increased sales in his store if he made certain improvements and remodeling, and refused to renew the agreement if he did not agree to have Ohio Valley cause the improvements to be made and charged to his Store Account. Ohio Valley insisted on these capital expenditures, totaling approximately $50,000, despite its knowledge of Mr. Kesireddy's stated deficit.

Mr. Kesireddy believed that he had no choice but to agree to pay for the improvements and renew the 2001 Franchise Agreement. If he refused and Ohio Valley failed to renew his franchise as they threatened to do, he faced losing his entire investment in the franchise because Ohio Valley had no obligation to purchase the store assets or good will, and it would be difficult to find a third-party buyer for a store that was losing money every month due to the constraints placed on its operation by Ohio Valley. Mr. Kesireddy signed the Agreement to Renew Franchise Agreement, Sublease and Credit and Security Agreement on September 6, 2005. Verified Complaint, Exh. E. Since the improvements were made to his store and charged to his account, Mr. Kesireddy's account deficit has increased to $98,375.44, yet his monthly gross revenue from the store has remained the same, approximately $31,000 per month.

In January, 2006, just four months after it renewed his franchise, Ohio Valley sought to force Mr. Kesireddy to purchase one of their corporate stores, store # 29008, despite the fact that the store was operating at a deficit and was located 55 miles from his home. Ohio Valley threatened Mr. Kesireddy that if he did not agree to sell his existing store on their terms (remaining personally liable for any remaining deficit) and purchase the offered corporate store (requiring an additional capital outlay of $65,000), that they would terminate his renewed Franchise Agreement, auction the assets of his store at what would surely be a loss, and continue to hold him personally liable on any remaining deficit and on for rental payments pursuant to the sublease through April 2009. When he declined to purchase Store #29008, they tried to make him purchase another corporate store, also operating at a deficit.

Mr. Kesireddy refused to concede to the extortionate demands of Ohio Valley. Within 24 hours of his refusal to sell his current store and buy either of the failing corporate stores, Ohio Valley served Mr. Kesireddy with a Notice of Default and Franchise Agreement declaring that, unless Mr. Kesireddy repaid the purported deficit of $98,374.44 on his Store Account, plus six months of advance operating capital, by February 10, 2006, Ohio Valley would take possession of his store, change the locks and take further action to liquidate its assets. Verified Complaint, Exh. F. One day later, Ohio Valley sent a Supplementation to Notice of Default and Termination of Franchise Agreement, restating the amount required to cure the default as $126,875.44. Verified Complaint, Exh. G.

Although Ohio Valley does not own the real estate on which the AmeriStop store is located and did not finance Mr. Kesireddy's purchase of the franchise, inventory or equipment, Ohio Valley has at all times taken the position that it must have a first priority lien on all of the assets of each franchisee, and refuses to permit any entity, including a bank or other financing institution, to take a senior lien on the assets of the business. This prohibition has made it impossible for the Franchisees to obtain financing to cure the alleged defaults. Ohio Valley knows that its demand for payment of $126,875.44 in 5 business days is not only unreasonable, but impossible to meet.

Ohio Valley has acted in bad faith by insisting on immediate repayment of the alleged deficit now, when only four months ago, it did not insist on repayment of the deficit but instead forced Mr. Kesireddy to incur an additional $50,000 of debt. Terminating his franchise just months after requiring this additional investment, without

allowing the franchisee time to recoup his additional investment, would unjustly enrich

Ohio Valley.

### D.     Ohio Valley's Threats to Mr. Dubba

Mr. Dubba's 2001 Franchise Agreement expires by its terms on March 31, 2006.

On November 14, 2005, Ohio Valley sent to Mr. Dubba a proposed renewal Franchise

Agreement (hereafter referred to as the "2006 Franchise Agreement") that Mr. Dubba

would be required to sign if he wanted to renew his franchise.  Verified Complaint, Exh.

H.  The proposed 2006 Franchise Agreement would make significant changes adverse to

the Franchisees including an increase in royalties from 4% to 6% of sales (Section 21.1);

a required $15,000 renewal fee versus none in the previous agreement (Section 20.4); and

significant detrimental changes in the method for determining the price paid by Ohio

Valley if it chooses to purchase the assets of the franchise upon termination or non-

renewal (Section 17.6).

In addition, the 2006 Franchise Agreement would give Ohio Valley the right to

set maximum retail prices with no limits on that discretion (Section 9.11) and provide

that all supplier and vendor payments of any kind whatsoever to be the property of Ohio

Valley and will not be credited to the franchisee's Store Account (Section 13.2).

The proposed 2006 Franchise Agreement is unconscionable.  Under its  terms and

conditions, it is virtually guaranteed that any franchisee will operate its store at a deficit

and become further and further mired in debt to Ohio Valley, at which point Ohio Valley

will repossess the store and the franchisee will lose its entire capital  investment and

years of hard work.  The 2006 Franchise Agreement, offered to Mr. Dubba at a time

when his 2001 Franchise Agreement is about to expire and he has a stated deficit to Ohio

Valley (according to their own suspect accounting), places him in a position of undue

duress and coercion. The parties have completely unequal bargaining power, and Mr. Dubba has no viable options.

Mr. Dubba has not yet signed the 2006 Franchise Agreement. In retaliation, Ohio Valley, on February 2, 2006, sent to Mr. Dubba a "Demand and Notice [sic] Default and Termination of Franchise Agreement", purporting to be "a final 10 day prior written notice of termination" of the 2001 Franchise Agreement and Related Agreements. In the Notice, Ohio Valley threatens to take possession of the store and change the locks on February 10, 2006, if Mr. Dubba does not make prior payment of $47,359.05 allegedly owed to Ohio Valley. Verified Complaint, Exh. I.

The Notice was sent to an incorrect address and did not reach Mr. Dubba until Friday, February 3, 2006, giving him only five business days notice of the draconian penalty that Ohio Valley seeks to impose.

### E. Ohio Valley's Threats to the Patels

The Franchise Agreement between the Patels and Ohio Valley expires by its terms on December 31, 2005. It has been the custom and practice of Ohio Valley to send renewal Franchise Agreements to its Franchisees without request or notice from the franchisee. Ohio Valley did not send the Patels a renewal agreement.

Ohio Valley leases the land on which the Patels' AmeriStop store is located from a third party, the Lessor, pursuant to a lease that does not expire until 2009. Ohio Valley, as Lessee, subleases the premises to the Patels. Ohio Valley told the Patels that it would not renew their 2001 Franchise Agreement unless and until the Patels intervened with the Lessor to procure for Ohio Valley's benefit an extension of the prime lease between Ohio Valley and Lessor. The Patels responded that they had no power to intervene with the Lessor. Ohio Valley sent the Patels a letter stating that Ohio Valley declined to renew the

Franchise Agreement and Sublease for their store, and giving the Patels 30 days to vacate the premises. Verified Complaint, Exh. J.

Ohio Valley did not give any reason in the letter for refusing to renew the Franchise Agreement. Verbally, it told the Patels it was because they had not given notice 12 months in advance of their desire to renew. This reason is purely pretextual, given the custom and practice of the parties. The Patels are not operating at a deficit and are not in breach of the 2001 Franchise Agreement. Ohio Valley has decided not to renew the Patels' franchise on the basis of their race and national origin.

### F.     Ohio Valley's Threats to Mr. Tokala

Ohio Valley sent a notice of default dated January 24, 2006 to Mr. Tokala, stating that "[i]t has come to our attention that First Financial Bank continues to maintain a security in the asset [sic] of the AmeriStop Food Mart 29003 prior in right to that of Ohio Valley AFM, Inc. As you have been repeatedly informed Ohio Valley AFM, Inc. does [sic?] consent to such security interest." Exh. K. Although the Notice does not so state, presumably the reason for referring to it as a "30-day notice of default" is to give Mr. Tokala the opportunity to cure the alleged default by "immediate [sic] have First Financial Bank release its superior security interest."

Ohio Valley knows that the demand it has made of Mr. Tokala is impossible for him to comply with. First Financial Bank has a senior security interest in Mr. Tokala's franchise store because it financed his purchase of the franchise store. Indeed, no reasonable lender would finance the purchase of a business without taking a first security interest on the assets of the business. Ohio Valley also knows that Mr. Tokala cannot simply satisfy his debt to First Financial Bank, because Mr. Tokala's AmeriStop store is operating at a loss as a result of the actions and omissions of Ohio Valley described

{W0646537.1}                                              13

above, and as a result Mr. Tokala has a substantial deficit in his Store Account (according to Ohio Valley's accounting).

## III.   DISCUSSION

### A.   Ohio Valley's Unilateral Actions Have So Utterly Destroyed the Essential Purpose of the Agreements That Rescission Is Warranted

"It is a fundamental principle of equity that a breach of contract which is so substantial and fundamental as to defeat the object of the parties in entering into the contract entitled the other party to a rescission and cancellation thereof." *Gene Boyer Ins., Inc. v. Aey*, 1978 WL 215043, *6  (Ohio App. 7 Dist. 1978) (finding rescission would be appropriate if the trial court found a substantial breach of a covenant not to compete and could restore the parties to their original position; see also *Sykes Const. Co., Inc. v. Martell*, 1992 WL 2919, *6 (Ohio App. 9 Dist. 1992) (noting that "[i]t is fundamental that a material and substantial breach of contract by one party entitles the other to rescind" and affirming rescission where defendant had not performed consulting services as required under contract); 18 Ohio Jur.3d Contracts Sec. 265 (stating that "as a general rule, where there is a material and substantial breach of contract and an entire or substantial failure of consideration, the injured party is entitled to rescission of the contract and restitution of any money paid.") (citing *Yurchak v. Jack Boiman Const. Co.*, 3 Ohio App.3d 15, 16, 443 N.E.2d 526, 529 (Ohio App. 1 Dist. 1981)).[2]  "[If] it is impossible to place the parties in their original situation, the court will adjust and balance the equities of the parties and grant rescission upon such terms and conditions as appeal to it as equitable." *Gene Boyer Ins.*, 1978 WL 215043 at *7 (quotation omitted).

---

[2] The 2001 Franchise Agreements provide that they are governed by the law of the State in which the Store is located; all of the Franchisees' AmeriStop stores are located in Ohio.  Franchise Agreement, Section 21.3.

In the present case, Ohio Valley has breached numerous significant and express provisions of its franchise agreements with the Franchisees, it has breached its duty of good faith and fair dealing by acting to impair the Franchisees' benefits under the agreements, and has violated the fiduciary duties it assumed in conducting its franchise relationships. Ohio Valley's unilateral actions have so utterly destroyed the purpose of the contracts –the operation of AmeriStop convenience stores to generate profits for both the franchisor and franchisees – as to justify rescission of the parties' franchise agreements.

**1.    Ohio Valley has materially breached express terms of the Franchise Agreements**

Ohio Valley has breached critical express provisions of the 2001 Franchise Agreements. In particular, Ohio Valley has failed to credit purchase discounts to the Franchisees as required by the Section 13.10 of the contract. Ordinarily, the presence of such credits constitutes the difference between making and losing money on sales – in this case, the deprivation of discounts has contributed to losses.

Ohio Valley also has failed to promptly and accurately account to Franchisees, in violation of Section 13.7 of the 2001 Franchise Agreements, making it exceedingly difficult for Franchisees to know the financial results of their day-to-day operations and to determine whether they are being credited with all income received and payments made. In addition, Ohio Valley has failed to provide any meaningful guidance in the operation of the stores as required under Section 2.2, instead dictating conditions without any consideration for the nature or operating costs of the store.

Ohio Valley's breaches of the few terms of the 2001 Franchise Agreements that impose any obligations on it go to the root of the contract – they eliminate the ability of

the Franchisees to exercise their independent judgment as independent business owners, and they make it impossible for the Franchisees to earn a profit on the operation of their stores.

### 2. Ohio Valley has breached the implied duty of good faith and fair dealing

Ohio Valley's breach of its duty of good faith has been even more egregious and damaging. Under Ohio law, "every contract contain[s] an implied duty for the parties to act in good faith and to deal fairly with each other. Any agreement--whether a lease, a secured loan, or something else--has an implied covenant of good faith and fair dealing that requires not only honesty but also reasonableness in the enforcement of the contract." *Littlejohn v. Parrish*, 163 Ohio App.3d 456, 463, 839 N.E.2d 49, 54 (Ohio App. 1 Dist. 2005). A party breaches this duty in particular when it has discretionary authority to specify certain terms of the contract and abuses this power or otherwise interferes with the other party's ability to perform under the contract. *Id.*

Ohio Valley has repeatedly and consistently acted in bad faith in violation of this contractual duty. The franchisor has taken opportunistic advantage of terms left unspecified by the contract to line its own pockets by depriving the Franchisees of the benefits of their bargain. Ohio Valley has entirely taken over the selection of and negotiation with vendors for the terms of sale to the exclusion of the Franchisees. Ohio Valley has withheld from the Franchisees information concerning the price they pay per unit of merchandise and rebates to which they are entitled. Because the Franchisees cannot discover the price they pay for goods, they are unable to make informed judgments concerning retail prices. Furthermore, Ohio Valley is believed to have

received kickbacks or allowances from vendors in exchange for inflated prices on the wholesale contracts.

Ohio Valley has further breached its duty of good faith and fair dealing by mandating retail prices, a right that was not granted by the 2001 Franchise Agreement. Ohio Valley has dictated prices that have resulted in losses for the Franchisees, forcing the Franchisees further and further into debt to Ohio Valley. Ohio Valley has used and continues to use this alleged debt as leverage in its renewal negotiations with the Franchisees. It is patently unjust to permit Ohio Valley to terminate any of the Franchisees' franchises based on alleged deficits in their Store Accounts, when, to the extent that the Franchisees' stores are operating at a loss, it is due to the prices, policies, practices and procedures mandated by Ohio Valley.

Ohio Valley continues to make money, even where the Franchisees are forced to sell at a loss, because it receives its 4% royalty on the Franchisees' gross sales, not profit. In addition, Franchisees believe it is receiving secret kickbacks from vendors for requiring the Franchisees to buy from those vendors. Ohio Valley's actions have deprived the franchisees of the ability to realize the intended benefit from their contracts with Ohio Valley. This is a patent breach of Ohio Valley's duty of good faith and fair dealing.

### 3. Ohio Valley has breached its fiduciary duty

Although a franchise relationship does not, by itself, create a fiduciary duty on the part of the franchisor, Ohio Valley's usurpation of all accounting and financial management functions has placed it in the position of agent of the Franchisees with attendant fiduciary duties. Under Ohio law, "[a] fiduciary relationship is one in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust."

{W0646537.1}                        17

*Stone v. Davis*, 66 Ohio St.2d 74, 78, 419 N.E.2d 1094, 1097-98 (1981) (finding that bank may have fiduciary relationship with customer when offering advice on mortgage insurance) (quoting *In re Termination of Employment*, 40 Ohio St.2d 107, 115, 321 N.E.2d 603 (1974)). A fiduciary has a duty "created by his undertaking, to act *primarily for the benefit of another* in matters connected with his undertaking." ' " *Hurst v. Enterprise Title Agency, Inc.*, 157 Ohio App.3d 133, 144, 809 N.E.2d 689, 697 (Ohio App. 11 Dist. 2004) (quoting *Strock v. Pressnell*, 38 Ohio St.3d 207, 216, 527 N.E.2d 1235 (1988)) (emphasis in original).

In taking upon itself to act as the accountant for the Franchisees and to handle their finances without providing the Franchisees with the necessary information to make informed and independent business judgments, Ohio Valley acquired a position of superiority and required Franchisees to repose a special confidence and trust in its integrity and fidelity. Ohio Valley has a corresponding duty to act primarily for Franchisees' benefit in managing those accounts. In fact, Ohio Valley has total control of all money received by the Franchisees, which they are required to deposit daily in bank accounts over which the Franchisees have no power. Ohio Valley pays all invoices and other obligations of the store from these accounts. Franchisees cannot even withdraw any profits, other than twice a year.

Franchisees have uncovered evidence of errors in Ohio Valley's management of the Store Accounts. Ohio Valley has failed to pay invoices on time, resulting in late fees being charged to the Franchisees and paid by Ohio Valley out of their Store Accounts. Ohio Valley has paid vendors twice for the same invoice, resulting in double charges to the account. Ohio Valley has, more than once, charged a franchisee for the payment of

invoices for the store of a different franchisee. Ohio Valley is not accurately and promptly crediting Franchisees for purchase discounts from vendors. Ohio Valley seeks to terminate the Franchisees based on purported deficits in their Store Accounts, yet its accounting is flawed and suspect.

Likewise, Ohio Valley assumed a fiduciary duty when it took it upon itself to dictate both the wholesale prices paid by Franchisees without even informing them of the amount of those prices(or the associated rebates) and at the same time dictating the retail prices Franchisees could charge. The Franchisees had no choice but to trust Ohio Valley to establish prices that would allow them to earn a profit. Ohio Valley knew that in both respects, Franchisees were relying on its bona fides in conducting business and managing finances on their behalf.

In hiding rebates, setting retail prices at levels below cost, and accounting practices that are at best incompetent and at worst fraudulent, Ohio Valley has breached its fiduciary duties to Franchisees. As a result of this breach of fiduciary duties and the related contractual breaches, Ohio Valley unilaterally destroyed the essential purpose of the 2002 Franchise Agreements – to create an opportunity for both the franchisor and the franchisee to earn profits from their ventures.

### 4. Ohio Valley has subjected Franchisees to duress

Finally, Ohio Valley has further used the 2001 Franchise Agreement as a means of coercion in an attempt to force Franchisees to enter into unconscionable renewal contracts. Because the 2001 Franchise Agreement gives the Franchisees no right to renewal and no right to have their franchise assets purchased at fair market value, Franchisees are faced with the choice of renewing on unconscionable terms, or risk losing their substantial investments in their franchises.

**B.    Ohio Valley Is Discriminating Against Franchisees on the Basis of Their Race in Violation of 42 U.S.C. Section 1981**

Franchisees are all natives of India. Ohio Valley has threatened Franchisees with termination or nonrenewal of their Franchise Agreements because they are Indian. It is treating them differently from similarly situated holders of AmeriStop franchises who are not Indian. This conduct violates 42 U.S.C. Section 1981, which prohibits discrimination on the basis of race in the making, performance, modification, and termination of contracts.

Injunctive relief is appropriate to prevent a violation of Section 1981. *Sud v. Import Motors, Ltd.*, 379 F.Supp. 1064 (W.D. Mich. 1974) (natives of India who were denied an automobile franchise allegedly on the basis of their race and national origin were entitled to a preliminary injunction restraining the manufacturer from transferring the franchise to a third party).

**C.    Franchisees Are Entitled Under Fed. R. Civ. Pro. 65(b) to a Restraining Order and, After Hearing, a Preliminary Injunction, to Preserve the Status Quo**

Franchisees are entitled to immediate injunctive relief under Rule 65(b), because they have demonstrated that there is a substantial likelihood that they will succeed on the merits of their claims, that Franchisees will suffer substantial and irreparable injury unless Ohio Valley's attempts to terminate their Franchise Agreements are enjoined, that issuance of a temporary restraining order and preliminary injunction will not cause substantial harm to others, and that the public interest will be served by issuing a temporary restraining order and preliminary injunction. *Mason County Med. Assoc. v. Knebel*, 563 F.2d 256 (6th Cir. 1977); *Maupin v. Stansbury, Ky.*, 575 S.W.2d 695 (1978). If Ohio Valley is permitted to continue in its course of intimidation, threats, coercion and

bad faith and improperly terminate the Franchise Agreements and lock Franchisees out of their own stores, the harm to Franchisees' business and investments cannot be undone or fully compensated by money damages.

Where, as here, Franchisees are seeking a court-ordered accounting of the Store Accounts and all discounts and allowances improperly withheld, it would be fundamentally unfair to permit Ohio Valley to terminate the franchises on the grounds of alleged deficits in those accounts, before an accounting can be made.

A temporary restraining order, enjoining Ohio Valley from taking the drastic actions threatened in their Notices, will merely preserve the status quo until the Franchisees can be heard on their statutory, common law and contractual claims. Ohio Valley will not be harmed by allowing the Franchisees to continue to operate their stores for a short period. Ohio Valley already has security interests in all of the Franchisees' assets, including equipment and inventory, and the personal guarantees of each of the Franchisees.

Finally, the public interest will be served by a temporary restraining order as it will prevent violations of the Franchisees' civil rights and the miscarriage of justice.

{W0646537.1}                                    21

Respectfully submitted,

_____

Robert B. Craig (#15590)
John R. Potter (#90690)
TAFT, STETTINIUS & HOLLISTER, LLP
1717 Dixie Highway, Suite 340
Covington, KY 41011-4704
Phone: (859) 331-2838

OF COUNSEL:

Marcia V. Andrew
TAFT, STETTINIUS & HOLLISTER LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202-3957
Phone: (513) 331-2838

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served via regular U.S. Mail,

postage prepaid, upon John Cox, statutory agent for Defendant Ohio Valley AFM, Inc.,

3955 Alexandria Pike, Cold Spring, KY, 41076, this 7th day of February, 2006.